**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|                              |   |                                       |
|------------------------------|---|---------------------------------------|
| JOSEPH ARUANNO,              | : |                                       |
|                              | : | Civil Action No. 15-7405 (JLL)        |
| Petitioner,                  | : |                                       |
|                              | : |                                       |
| v.                           | : | **OPINION**                           |
|                              | : |                                       |
| SHERRY YATES, et al.,        | : |                                       |
|                              | : |                                       |
| Respondents.                 | : |                                       |
|                              | : |                                       |

**LINARES**, District Judge:

Presently before the Court is the amended petition for a writ of habeas corpus of Joseph Aruanno ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his involuntary commitment under the New Jersey Sexually Violent Predator Act (ECF No. 5). Respondents filed an answer to the petition (ECF Nos. 8-9), to which Petitioner has replied (ECF Nos. 12, 15). For the following reasons, the Court will deny the petition and no certificate of appealability shall issue.

## I.  BACKGROUND

Petitioner is currently civilly committed to the Special Treatment Unit (STU) in Avenel, New Jersey, pursuant to New Jersey's Sexually Violent Predator Act (SVPA), N.J. Stat. Ann. § 30:4-27.24 et seq. The facts relevant to his current habeas petition, which attacks his 2011 commitment review hearing in which the state trial court determined that Petitioner should remain committed for the foreseeable future, were summarized as follows in the opinion of the Superior

Court of New Jersey – Appellate Division, which affirmed Petitioner's continuing commitment:

> J.A. was born in 1963 and is currently fifty-two years old.  He was first convicted of a sexual offense in Florida in 1994 based on evidence that he exposed himself to two adolescent girls as they were walking home from school and then masturbated in their presence.   J.A. pled guilty to second-degree lewd conduct and was sentenced on November 8, 1994 to ten years probation.
>
> The predicate offense occurred on December 10, 1996, in Wildwood, New Jersey.  J.A. approached an eight-year-old girl, G.V., who was playing with her younger sister on the front porch of their home. J .A. then pushed G.V. against the front porch, put his hand down her pants, grabbed her vaginal area, and fled the scene. J.A. was apprehended in the neighborhood and identified by the girls.  A jury convicted J.A. of second-degree sexual assault, and on February 5, 1999, he was sentenced to ten years imprisonment with a five-year parole disqualifier.   We affirmed his conviction in an unpublished opinion.
>
> On April 16, 2004, the State filed a petition to commit J.A. under the SVPA.  On April 22, 2004, the Law Division entered an order temporarily committing J.A. to the STU, and on May 9, 2005, following a full hearing, the court entered judgment declaring J.A. a sexually violent predator in need of involuntary commitment.  J.A. appealed the trial court's judgment and we affirmed.
>
> [The Appellate Division then described Petitioner's hearing on his motion to enforce litigant's rights, the appeal of which was consolidated with his review hearing appeal for the purposes of producing a single opinion.]
>
> [Petitioner's commitment review hearing] also forms a basis for this appeal [and] was conducted on March 15 and 22, 2011, before Judge James F. Mulvihill.   The State presented two experts, Debra Roquet, Psy.D., and Maryanne DeSantis, M.D.[;] J.A. offered no conflicting evidence.
>
> Dr. Roquet, a psychologist and member of the Treatment Progress Review Committee (TPRC) at the STU, testified that she reviewed J.A.'s treatment progress on September 30, 2010. Although J.A. was invited to participate in the review, he refused to

2

attend.   In her TPRC report, Dr. Roquet recommended that J.A. continue in Phase One of treatment.   Phase One is the period "prior to a resident becoming engaged in the treatment process." According to Dr. Roquet, this stage of treatment is considered "appropriate" for residents who refuse treatment.   Since April 2004, when J.A. was admitted to the STU, Dr. Roquet testified that J.A. has consistently refused treatment despite the STU's efforts to engage and encourage him to participate.

Dr. Roquet diagnosed J.A. as suffering from impulse control disorder not otherwise specified (NOS), and paranoid personality disorder with narcissistic features.   She also made provisional diagnoses of pedophilia and exhibitionism, stating:

> Provisional means that there's reason to believe that if we had more information we would be able to say with confidence that the person's behaviors, thoughts, urges, and so on, are such that he does meet criteria for those diagnoses, but we do not have enough information to make the diagnosis with confidence at this time.

Dr. Roquet explained that J.A.'s past actions support these diagnoses but since he refuses treatment there is no clear understanding of his thoughts and sexual fantasies.

Dr. Roquet testified that J.A.'s paranoid personality disorder predisposes him to sexually reoffend in two ways:

> In that whatever risks [J.A.] does have to reoffend, we are not able to have an impact on that risk because he is extremely resistant to treatment. And I believe that, in my opinion, the main reason— the main obstacle and the cause of [J.A.]'s consistent resistance to treatment is because of this personality disorder.

> The second reason is because of the rigid and hostile way that he sees his world.  I know that the [c]ourt is familiar with the idea of a sexual offense cycle.  And with the build-up and a person who is living in the world and seeing everything through this kind of lens, is going to be in what we would call a

3

build-up.

> For example, he's going to be feeling tense. He's going to be feeling vigilant. He's going to be feeling maybe unhappy, maybe very angry. So, whatever disposition there might be to act out, he's certainly going to be closer to the threshold of acting out th[a]n he would be, were he not in this kind of state of mind.

Dr. Roquet confirmed that the 1996 offense against the eight-year-old victim is consistent with impulse control disorder. She further explained that J.A. also appears to suffer from "some paraphilic sexual urges" which is why she included the provisional diagnoses of pedophilia and exhibitionism. Dr. Roquet testified that "the two times [J.A.] has acted out illegally, it has been to sexually offend against minors." She stated:

> [A] person with an [i]mpulse [c]ontrol [d]isorder might go up and, you know, punch a guy in the nose. A person with an [i]mpulse [c]ontrol [d]isorder might do any number of things. Of the world of things that a person with an [i]mpulse [c]ontrol [d]isorder might do is—there does seem to be at least some kind of indication that he seems to be driven to act out impulsively in a sexual manner against minor females.

Dr. DeSantis, a psychiatrist, did not have an opportunity to meet with J.A., as he declined to be interviewed. Therefore, she based her evaluation of J.A. on a review of his STU records and past evaluations. Dr. DeSantis noted that J.A. "has been on treatment refusal status for many years."

Dr. DeSantis diagnosed J.A. as suffering from depressive disorder NOS and paranoid personality disorder. She opined that J.A.'s paranoid personality disorder predisposes him to commit sexual crimes:

> [A] person with [p]aranoid [p]ersonality [d]isorder perceives the world—almost the entire world—as threatening. So even an innocent remark or a ... thing that . . . a person without this particular

4

personality disorder would ignore[,] would seem a threat to [J.A.] or anyone . . . with a[p]aranoid [p]ersonality [d]isorder.

. . . [W]ith one of his sexual offenses, according to the available records, it was said that there were two teenage girls . . . [J.A.] was relieving himself, and the teenage girls said that was disgusting, and then [he] got in the truck, and drove by them and exposed himself.

Dr. DeSantis testified that J.A. "decompensates rapidly" during periods of increased stress, and that his reality includes "paranoid distortions." J.A.'s personality disorders cause him to refuse treatment at the STU, because he perceives "the interpretation of others' innocent remarks as insulting or demeaning, or the interpretation of neutral events as presenting or conveying a threat."

Dr. DeSantis testified that J.A. was "highly likely" to recidivate if not confined to a secure facility for control, care, and treatment. She noted that J.A. scored a six on the Static–99, [an actuarial table used to predict the likelihood of re-offense by an SVP,] which placed him in "the high-risk category for being charged or convicted of another sexual offense." Dr. DeSantis also conducted a risk assessment of seventeen static and dynamic risk factors. In her report, she concluded:

> [I]t does not appear unequivocally that [J.A.] has a paraphilia. The two sex offenses of which he was found guilty seem to have been committed as a response to the inner rhythm of his paranoid personality disorder; and there is no evidence in the available records to suggest he has engaged in any other sexually deviant behaviors or currently engages in them. However, his choice of sexual offending as a way of responding to that paranoia— rather than, for example, destroying street signs or throwing eggs at fire trucks—is seriously troubling, and merits further exploration. Unfortunately, this is unlikely at present, due to [J.A.]'s untreated psychiatric diagnoses.

. . . .

5

Therefore, in my opinion, with a reasonable degree of certainty, [J.A.] meets the qualifications for [the] definition of having a mental abnormality and personality disorder that place him at high risk of engaging in acts of sexual deviancy; and he lacks the emotional, cognitive, and volitional capacity not to act if he is not confined to a secure facility for his control, care, and treatment.

At the close of the evidence, Judge Mulvihill concluded that J.A.'s commitment should continue.  Judge Mulvihill found Dr. Roquet's testimony "very credible, very forthright in terms of her interest, her demeanor, very knowledgeable about the case, and evenhanded. . . ."   Similarly, he also found Dr. DeSantis's testimony "very forthright [and] very credible."   The court noted Dr. Roquet's observation that J.A. "denigrates those with whom he is involved" was supported by J.A.'s demeanor at the hearing.   In ordering J.A.'s continued commitment, Judge Mulvihill reasoned:

> [T]here's clear and convincing evidence prov[ing] that [J.A.] . . . has been convicted of sexually violent offenses, that he continues to suffer from a mental abnormality or personality disorder, clear and convincing evidence that [J.A.], at this time, is highly likely to engage in further acts of sexual violence if not confined in a secure facility for control, care, treatment, and these are all conditions [that] could not spontaneously remit and can only be mitigated by way of treatment.
>
> He has [had] no treatment whatsoever.  His ... [p]aranoid [p]ersonality [d]isorder—is interfering with him getting treatment.   So, it's circular and he's not likely to move forward until he actually starts treatment.   So, he's at high risk to sexually re-offend by clear and convincing evidence.

(Document 21 attached to ECF No. 9 at 1-13, internal citations omitted).

Although the Appellate Division's summary provides most of the facts which are relevant to Petitioner's current habeas challenge, the nature of Petitioner's current claims also requires a

6

brief discussion of Petitioner's interaction with the trial court and the procedural history of this matter.   On March 15, 2011, Petitioner appeared before Judge Mulvihill for the first court appearance on his annual commitment review hearing.   (*See* Document 9 attached to ECF No. 9). At that hearing, a public defender entered an appearance on behalf of Petitioner.   Following that entry of appearance, the following colloquy occurred:

> [Petitioner]: For the record, [the public defender] does not represent me.   I made that clear to the Court.   He's –
>
> THE COURT:   You don't . . . speak until you're . . . asked to speak. You understand?   Did you finish, sir?
>
> [The Public Defender]:   Well, I . . . did.   But I would add, Your Honor, that –
>
> THE COURT:   Now, you are . . . [Petitioner's] attorney, correct?
>
> [Petitioner]: No, Your Honor.
>
> [The Public Defender]: Your Honor, I am perfectly willing and the State is willing to represent [Petitioner].
>
> THE COURT:   Well, the statute provides [that the Public Defender's Office] will represent him.   And you're assigned by your office to represent him, correct?
>
> [The Public Defender]:   Yes, Your Honor.
>
> THE COURT: So you're representing him, number one.   Now, [Petitioner], you want also to speak on your behalf?   You can do that too, sir.
>
> [Petitioner]: Okay.
>
> THE COURT: You understand that?   You understand that?
>
> [Petitioner]: Not really.
>
> THE COURT:   Oh, you don't understand that?   Okay.   The

7

statute provides [that] you must be represented by the Public Defender.

[Petitioner]: That's my issue.

THE COURT: A Public Defender must be here representing you, all right?

[Petitioner]: They're refusing to do that for two years.[1]

THE COURT: I'm not finished, sir.   Don't interrupt me.   Don't interrupt me.   You understand?

[Petitioner]: No, I don't.

THE COURT:   You don't understand about interrupting?   Now, if you can't handle this, you're not going to be at this hearing.   So, you better listen to me.

That means that [the public defender] will be here representing you.   You can also speak on your own behalf.   So you have the best of both worlds.

[Petitioner]:   All right.   I'm willing to agree with that.

(Document 9 attached to ECF No. 9 at 3-4).

Petitioner's review hearing then commenced.   During the review hearing, although the public defender cross-examined the witnesses thoroughly, the trial court permitted Petitioner to engage in his own cross-examination, and permitted Petitioner to raise his own objections.   (*See generally* Documents 9-10 attached to ECF No. 9).   Likewise, counsel for Petitioner acquiesced

---

[1] Although Petitioner insists that there was a delay in his having annual review hearings based on inaction by the Public Defender, a review of his motion to enforce litigant's rights proceedings indicates that Petitioner had actually chosen to wave annual review hearings until such time as his habeas petition challenging his original commitment hearing had run its course to prevent that petition from becoming moot.   (*See* Document 1 attached to ECF No. 9 at 8-13). Thus, at least some of this delay was the result of Petitioner's own tactical choices rather than any inaction on the part of his lawyers.

to Petitioner's wishes where their strategies conflicted.  (*See, e.g.,* Document 9 attached to ECF No. 9 at 30).  Thus, throughout his hearing, Petitioner received both the benefit of counsel's thorough questioning of the expert witnesses and the ability to present any evidence he wished, including being permitted to cross-examine the witnesses against him in addition to the questions asked by counsel.

Following the conclusion of the first day of the hearing, Petitioner returned for a second day of testimony on March 22, 2011.   At the beginning of that hearing, the State called a second expert witness to testify as to Petitioner's mental state, at which point Petitioner objected, resulting in the following colloquy:

> [Petitioner]: I would object [to the calling of another expert witness], Your Honor.
>
> THE COURT: Oh, I'm sorry.   Yes, you object?   All right.
>
> . . . .
>
> What's your . . . objection?
>
> [Petitioner]:   That – as the same as last time[,] where are my experts – my witnesses – they've postponed this from last March saying that I – they were going to get me an expert.   They're just using it as a ploy to put me off here.
>
> THE COURT: Uh-huh.
>
> [Petitioner]: I was going to be having experts, now they're lining up an army and . . . where are my experts to – they should be here.
>
> Actually, I spoke with some of my private attorneys[2] within

---

[2] On several occasions, Petitioner mentioned having private attorneys with whom he had conferred, but never references them by name, specifies who they are or in which case they are representing him, nor how they were connected to his review hearing.   No private attorney entered an appearance on Petitioner's behalf during the review hearing proceedings.

> the last week that — and that they're saying this is, you know, that I
> should be doing this — where my experts should be here listening to
> this to from rebuttal to help counsel — to assist counsel wit this to
> understand . . . the medical experts of this [case].
>
> They can line up — you know, it's just too one-sided in here.
> It's . . . too unequal.
>
> THE COURT:   Well, . . . the State has two witnesses.   They have
> the psychiatrist, . . . and [a medical doctor], and . . . she's part of
> [Petitioner's review team].   So, that's all the State has.
>
> You do have a right to an expert and I think . . . we have to
> have this hearing and you don't have your expert, so — but I think
> that if you . . . get an expert — I am going to make my decision . . .
> on what we have before us, but I think if there is an expert that comes
> up within — before the next Review Hearing — Mr. Attorney general,
> I would entertain . . . at least hearing that . . . expert. . . if [Petitioner]
> gets an expert sometime in the future.   Would [the State] have any
> objection to that, sir?
>
> [The State]:   No.

(Document 10 attached to ECF No. 9 at 4-7).   Both the Court and the State thereafter agreed that

Petitioner was free, if he did procure an expert who could provide favorable testimony, to file a

motion to reopen his hearing on the basis of a change in circumstances.   (*Id.* at 7).   Nothing in

the record suggests that Petitioner ever obtained an expert, let alone the numerous experts he argues

that he has to present in his habeas petition.

Following this colloquy, Petitioner's review hearing continued until Judge Mulvihill made

the findings presented in the Appellate Division opinion excerpted above and ordered that

Petitioner remain civilly committed.   Petitioner appealed that ruling to the New Jersey Appellate

Division.   (Document 21 attached to ECF No 9).   On direct appeal, the Appellate Division

consolidated Petitioner's appeal of his review hearing with an outstanding appeal on a prior motion

10

to enforce litigant's rights in which Petitioner challenged his being denied a job at the STU because he refused to participate in treatment and his being denied individual, as opposed to group, therapy. (*Id.* at 2-8).   The Appellate Division, having considered both appeals, denied both appeals in a single opinion on May 11, 2015.   (*Id.* at 14-20).   Petitioner thereafter filed a petition for certification, which was denied on September 18, 2015.   (Document 24 attached to ECF No. 9). Petitioner then filed his current habeas challenge.

## II.  DISCUSSION

### A.  Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.   *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).   Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts.   *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

(1) resulted in a decision that was contrary to, or involved an

11

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court.  *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."  *Id.*  Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## B.   The New Jersey Sexually Violent Predator Act

The New Jersey Sexually Violent Predator Act provides a means for the state to civilly commit individuals who have been convicted of certain classes of sexually violent offenses and therefore qualify as "sexually violent predators."  N.J. Stat. Ann. § 30:4-27.26.   Under the act, a sexually violent predator ("SVP") is a

Person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility

12

for control, care and treatment.

N.J. Stat. Ann. § 30:4-27.26(b).   This Court has previously explained the process provided for the

commitment of an SVP as follows:

> "When it appears that a person may meet the criteria of an SVP, an
> 'agency with jurisdiction,' such as the New Jersey Department of
> Corrections, provides notice to the New Jersey Attorney General at
> least ninety days before the anticipated release of this individual."
> *Greenfield v. Dep't of Corr.*, Civil Action No. 09-1969, 2011 WL
> 3203730, at *6 (D.N.J. July 27, 2011) (citing N.J. Stat. Ann. §§ 30:4-
> 27.26; 3:4-27.27(a)(1)).   Upon receiving such notice, the Attorney
> General, if he concludes that the interests of public safety warrant
> involuntary civil commitment of the individual involved, may bring
> an action for commitment under the SVPA.   *Id.*   Under the statute,
> such an involuntary commitment procedure may follow from the
> release of an offender from jail so long as the offender suffers from
> a requisite mental abnormality or personality disorder and the
> offender is therefore likely to engage in acts of sexual violence if
> not confined in a secure treatment facility.   N.J. Stat. Ann. §§ 30:4-
> 27.26; 30:4-27.28; 30:4-27.32(a).
>
> To initiate the commitment of an individual being released
> from imprisonment, the Attorney general must file a petition for
> commitment, supported by "two clinical certifications, one of which
> must be from a psychiatrist who has examined the individual no
> more than three days before the submission of the petition for
> commitment." *Greenfield*, 2011 WL 3203730 at *6 (citing N.J.
> Stat. Ann. §§ 30:4-27.26, 30:4-27.28).   Upon the filing of such a
> petition, the trial court conducts a temporary commitment hearing
> where that court examines the supporting certificates and must
> determine if probable cause exists to believe that the committee
> qualifies as a sexually violent predator under the act.   *Id.*   If the
> court finds probable cause, it issues a temporary commitment order
> pending a final hearing, which is normally scheduled within twenty
> days of the initial hearing.   *Id.*; N.J. Stat. Ann. §§ 30:4-27.28(f),
> 30:4-27.29(a).
>
> In advance of the final hearing, the committee is provided
> with copies of the clinical certificates and their supporting
> documents, the temporary commitment order, and a statement of the
> committee's rights at the final hearing.   N.J. Stat. Ann. § 30:4-

27.30(a). Those rights include the right to counsel and the appointment of counsel if the committee is indigent, the right to be present during the final hearing absent prior conduct which would prevent the court from reasonably conducting the hearing in the committee's presence, the right to present evidence, the right to cross-examine witnesses, and the right to a hearing in camera. *Greenfield*, 2011 WL 3203730 at *6 (citing N.J. Stat. Ann. § 30:4-27.31). Following the appointment of counsel where necessary, the final hearing is conducted. *Id.* At that hearing, the trial court hears evidence, including expert testimony from psychiatrists and members of the treatment team who have treated the committee during his temporary commitment who have within the last five days prior to the hearing conducted a personal examination of the committee. *Id.* If the court, following the hearing, concludes by clear and convincing evidence that the committee qualifies as an SVP, the court issues an order involuntarily committing the SVP to the STU. *Id.* The SVP may thereafter appeal the court's order or petition for discharge from the STU at any time, and by statute will receive annual review hearings at which the state is again required to prove by clear and convincing evidence that commitment as the SVP is warranted. *Id.* (citing N.J. Stat. Ann. §§ 30:4-27.35, 30:4-27.36). Although an individual's commitment as an SVP often follows the end of a criminal sentence, such commitment is civil, and not criminal in nature. *See Araunno v. Hayman*, 284 F. App'x 144, 150 (3d Cir.); *cert. denied*, 131 S. Ct. 835 (2010).

*Shelton v. Main*, No. 14-1635, 2015 WL 4548813, at *5 (D.N.J. July 27, 2015).

Following his final order of commitment, a civilly committed SVP is entitled to annual review hearings to determine whether the SVP's history, treatment, and mental issues continue to establish a basis for commitment. *Bagarozy v. Goodwin*, No. 08-648, 2008 WL 4416455, at *7 (D.N.J. Sept. 23, 2008). The same standards and burden of proof applicable to an initial commitment apply to these review hearings, and as such, the State is required at each review hearing to show by clear and convincing evidence that the SVP continues to meet the requirements for commitment under the act – that he suffers from a qualifying mental abnormality and that this abnormality makes him likely to reoffend. *Id.* Even aside from his annual reviewing hearings,

14

an SVP can also, at any time, petition for his release based on a change in circumstances, resulting in additional review. *Id.*

## C. Analysis

In his current habeas petition, Petitioner presents the following arguments: that he essentially suffered ineffective assistance of counsel both in the trial court and on appeal when he was represented by attorneys that he asserts did not represent him and against whom he has now filed civil complaints, that he was denied his right to self-representation at that hearing, that he was denied his right to trial by jury at his hearing, that the Appellate Division erred in deciding both the appeal of a prior treatment issue and the appeal from Petitioner's review hearing in a consolidated opinion, and that he was denied due process and equal protection when he was not permitted to present an expert of his choosing at the review hearing. Each of these claims is utterly devoid of merit, and this Court shall address each in turn, beginning with Petitioner's claim that he was entitled to a trial by jury.

## 1. Petitioner's Jury Trial Claim

Petitioner asserts that he was denied due process and his Sixth Amendment rights when his annual review hearing was held by way of a bench trial rather than by way of a jury trial. Petitioner's claim is not a novel one, and indeed, Petitioner himself has tried to raise such a claim before, albeit in the context of an action brought pursuant to 42 U.S.C. § 1983. *See, e.g., Aruanno v. Hayman*, 384 F. App'x 144, 152 (3d Cir. 2010); *Aruanno v. Goodwin*, No. 07-5205, 2013 WL 3821474, at *9 (D.N.J. July 22, 2013); *Fournier v. Corzine*, No. 07-1212, 2007 WL 2159584, at

*15 (D.N.J. July 26, 2007).   As the Third Circuit explained to Petitioner when he raised this claim

previously in *Hayman*,

> Although [Petitioner] insists that a sex offender must be afforded the
> right to a jury trial before his involuntary commitment, many of our
> sister circuits have held to the contrary.   For example, in *United
> States v. Carta*, 592 F.3d 34 (1st Cir. 2010), the First Circuit noted
> that "the claim to a jury trial right in civil commitments has been
> rejected under not only the Due Process Clause, but also the Sixth
> and Seventh Amendments." *Id.* at 43 (internal citations omitted)[;
> a]ccord *Poole v. Goodno*, 335 F.3d 705, 710-11 (8th Cir. 2003);
> *United States v. Sahhar*, 917 F.2d 1197, 1205-07 (9th Cir. 1990)[;]
> cf. *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1256 (10th Cir.
> 2008) (upholding administrative interpretation of statute regarding
> detention of certain aliens that did not provide for right to jury trial).
>
> The SVPA serves a regulatory-rather than penal-purpose, because it
> seeks to protect the public from possible future harm rather than to
> punish for criminal acts committed in the past. We therefore join our
> sister circuits in holding that the Constitution does not demand that
> a jury trial be provided before an individual is involuntarily
> committed by the state as a sexually dangerous person.

*Hayman*, 385 F. App'x at 151-52.   Indeed, as the Third Circuit noted in that case, the Federal

analogue of the SVP Act likewise does not provide a jury trial and has survived constitutional

scrutiny, albeit on grounds other than the right to trial by jury.   *Id.*at 151 n. 11; *see also United

States v. Comstock*, --- U.S. ----, 130 S. Ct. 1949 (2010).   Thus, as the Third Circuit held in

*Hayman*, it is clear that Petitioner has no federal right to a trial by jury.   As the New Jersey State

courts have likewise held that there is no state-created Due Process right to trial by jury under the

SVP Act, *see Fournier*, 2007 WL 2159584 at *14, Petitioner's jury claim is utterly meritless and

provides no basis for habeas relief.

16

2. **Petitioner's Ineffective Assistance of Counsel and Self Representation claims**

Petitioner also suggests that he suffered ineffective assistance of counsel when he was represented at his review hearing by an attorney he asserts did not represent him, and whom he claims was both conflicted by other civil filings, and failed to properly assert Petitioner's claims. Petitioner likewise asserts that his rights were violated when he was represented on appeal by a public defender who did not confer with him and whom he attempted to reject in a letter to the Appellate Division clerk.   Assuming *arguendo* that the Due Process Clause entitles Petitioner to the effective assistance of counsel during his review hearings and appeal, *see, e.g., Greenfield v. Dep't of Corr.*, No. 09-1969, 2011 WL 3203730 at *7-9 (D.N.J. July 27, 2011) (the Sixth Amendment does not apply to civil commitment hearings, but the Due Process Clause of the Fourteenth Amendment *may* entitle a civil committee subject to the SVPA to effective counsel), Petitioner's ineffective assistance claims must fail because he has failed to show that he suffered any prejudice as a result.

The standard which governs ineffective assistance of counsel claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).   To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

17

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his habeas petition, Petitioner asserts that counsel was ineffective in so much as Petitioner did not want assigned counsel to represent him and because counsel was allegedly

unprepared for the hearing.   As to Petitioner's assertion that he told the trial court that he did not want counsel to represent him, this Court notes that the trial court suggested to Petitioner that he could permit counsel to represent him and the trial court would permit Petitioner to also question the witnesses and address the court, to which Petitioner agreed.   Thus, Petitioner's claim that he clearly rejected counsel's representation directly ignores the fact that he chose to accept the offered hybrid representation format suggested by the trial court.   To the extent that Petitioner suggests that this in some way violated his "right" to represent himself, this Court will reject that argument for reasons set forth in more detail below.

In any event Petitioner fails to present any basis for the assertion that he was prejudiced by counsel's representation of him.   While Petitioner provides no more than conclusory allegations and bald assertions that counsel was ineffective or unprepared, the record more than refutes those assertions.   A review of the hearing transcript clearly indicates that counsel was familiar with the reports of the testifying experts, and that counsel ably cross-examined those witnesses, addressing various perceived weaknesses in their reports, including as to the diagnosed mental illnesses at the heart of Petitioner's review hearing.   Counsel's cross examination also indicated that counsel was familiar with Petitioner's history at the STU and his issues with treatment at that facility, including his history of disciplinary placements and treatment refusal.   Ultimately, the record does not support Petitioner's assertion that counsel was unfamiliar with the record or unprepared.   In any event, Petitioner has provided no additional allegations, let alone facts, which would indicate how he was allegedly prejudiced by counsel's representation.   As the record does not support Petitioner's assertion that counsel was unprepared or unfamiliar with his case, and as Petitioner has otherwise failed to provide any support for his allegations of prejudice, Petitioner has failed to

19

establish the prejudice prong of the *Strickland* test, and his claim of ineffective assistance of trial counsel must fail as a result. *See Palmer*, 592 F.3d at 395.

Petitioner also attempts to raise a claim of ineffective assistance of appellate counsel, asserting that he once again tried to fire appointed counsel, that counsel didn't discuss his case with him, and that not all of the issues he wished to raise on appeal were addressed by counsel. Petitioner also asserts that he had to file additional pro se appeals as a result. While *Strickland* applies to ineffective assistance of appellate counsel claims, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle . . . that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every nonfrivolous claim a defendant desires to make. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). As winnowing out weaker claims in favor of those more likely to succeed is the hallmark of effective appeallate advocacy, *id.* at 753; *Smith v. Murray*, 477 U.S. 527, 536 (1986), the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

In this matter, Petitioner asserts that appellate counsel was ineffective, but provides nothing but his assertion that he attempted to disavow counsel and attempted to raise additional pro se claims in support of the assertion that appellate counsel was ineffective. Petitioner provides no information as to what these additional claims are, or what merit they may have had. Petitioner has provided no more than a bald assertion of ineffective assistance of counsel, and has clearly failed to show that the claims he wished to raise were in any way of superior merit to those raised

20

by counsel.[3]   As Petitioner has not shown that his additional claims were in any way more likely to succeed than those raised by appellate counsel, and as nothing in the record presented to this Court suggests that Petitioner had any other viable appellate claims, Petitioner has failed to show that he was in any way prejudiced by counsel's appellate representation.   Indeed, as Petitioner has provided nothing but his own conclusory allegations as to the prejudice he allegedly suffered, this Court can reject his claim as being without merit on that basis alone.   *See Palmer*, 592 F.3d at 395.   As Petitioner has utterly failed to provide any argument, let alone factual support, for the contention that he was prejudiced other than his own bald assertions and conclusions, Petitioner has failed to show that he is entitled to habeas relief based on the ineffective assistance he allegedly received from appellate counsel.

In a related claim, Petitioner also asserts that the trial and appellate courts erred in refusing to permit him to represent himself without the assistance of assigned counsel.   Petitioner raised a nearly identical claim in his prior habeas petition challenging his order of commitment.   *See Goodwin*, 2013 WL 382474 at *9.   As Judge Hayden explained to Petitioner in her opinion,

> The SVPA requires that people subject to civil commitment proceedings must be represented by counsel at their hearings.   *See* N.J. [Stat. Ann. §] 30:4–27.29(c). Such a requirement is practical in light of the fact that an SVPA hearing takes place only after a court has found "probable cause to believe that the person is a sexually violent predator in need of involuntary commitment." N.J. [Stat. Ann. §] 30:4–27.28(g).   In order to qualify as a sexually violent predator, a person must "suffer[ ] from a mental abnormality or

---

[3] Indeed, given the extremely deferential standard of review applied by the New Jersey appellate courts to the review of civil commitments under the SVPA, *see, e.g., In re Civil Commitment of R.F.*, 85 A.3d 979, 991-92 (review of SVP commitments is "extremely narrow" as trial court commitment orders are entitled to "special deference" and can only be reversed where the record "reveals a clear mistake"), it is doubtful that Petitioner's unspecified arguments could have been successful absent some clear mistake Petitioner has failed to identify here.

21

> personality disorder." N.J. [Stat. Ann. §] 30:4–27.26. Thus, with a
> court having found probable cause that a person may suffer from
> such an abnormality or disorder, assignment of counsel is a
> reasonable protection to provide for those who might face civil
> commitment. Moreover, as repeated above, SVPA proceedings are
> civil in nature. Although a party has a right to represent himself in a
> criminal trial, *see Faretta v. California*, 422 U.S. 806, 835–36[]
> (1975); *Brathwaite v. Phelps*, 418 F. App'x 142, 146 (3d Cir.), *cert.
> denied*, [546 U.S. 1026] (2011), [Petitioner] fails to point to any
> authority supporting his assertion that he had a right to represent
> himself in his civil commitment proceeding. Therefore, the trial
> court's decision to appoint counsel and permit [Petitioner] to
> proceed in a hybrid-like fashion is not contrary to, nor does it
> involve an unreasonable application of, "clearly established Federal
> law, as determined by the Supreme Court of the United States." 28
> U.S.C. § 2254(d)(1).

*Id.* Those observations remain applicable in Petitioner's present challenge, where he was again

permitted to engage in a hybrid of having counsel and self-representation.

The only difference between Petitioner's original challenge and his current challenge is

Petitioner's assertion that the landscape of self-representation in SVP Act hearings was altered by

the New Jersey Supreme Court's decision in *In re Civil Commitment of D.Y.*, 95 A.3d 157 (2014).

In *D.Y.*, the New Jersey Supreme Court was squarely faced with a claim that SVPs are entitled to

represent themselves if they so choose, despite the statutory language of the SVP Act. In

addressing that question, the New Jersey Supreme Court first noted that SVPs are entitled to the

following process under the act – the right to be represented by counsel, including appointed

counsel if indigent, the right to be present at his hearing absent a determination by the court that

the SVPs conduct would impede the proceedings, the right to present evidence, the right to cross-

examine witnesses, and the right to an in camera hearing. *Id.* at 170. The court then addressed

the interaction of those rights with the requirement under the statute that SVPs appear only with

22

counsel:

> The presentation of evidence in an SVPA hearing and the cross-examination of the State's witnesses are seldom simple tasks. Given the statutory definition of a "sexually violent predator," expert witnesses in the fields of psychiatry and psychology routinely play leading roles in SVPA commitment hearings. Accordingly, in a typical SVPA commitment hearing, counsel for the individual subject to SVPA commitment must cross-examine the experts whose testimony is offered by the State, and may also present expert testimony on the committee's behalf.

> The Legislature acted to ensure that an individual who is facing an SVPA hearing does not confront the State's evidence without the assistance of counsel. In addition to the right to counsel included among the committee's rights in N.J. [Stat. Ann. §] 30:4–27.31, a corresponding provision, N.J. [Stat. Ann. §] 30:4–27.29(c), states that "[a] person subject to involuntary commitment shall have counsel present at the hearing and shall not be permitted to appear at the hearing without counsel." The language chosen by the Legislature—"shall have counsel present," and "shall not be permitted to appear" without such counsel—can be found in only one other statute, N.J. [Stat. Ann. §] 30:4–27.12(d), which governs the involuntary commitment of individuals outside of the SVPA.

> Significantly, the Legislature did not bar an individual facing SVPA commitment from representing himself or herself, or state that an individual may participate in the proceedings only through counsel. The Legislature's clear mandate—expressed in its affirmative requirement to have "counsel present," and its corresponding bar upon a committee's appearance "without counsel"—is that an attorney for the individual be in attendance and available to assist his or her client during the entire hearing. Given this reasonable reading of the Legislature's language, there is no need for us to reach D.Y.'s argument that the SVPA deprives him of his rights under the Sixth Amendment and principles of substantive due process by preventing him from appearing pro se. Our interpretation renders a constitutional adjudication avoidable because it is unnecessary.

> Accordingly, we hold that the plain language of N.J. [Stat. Ann. §] 30:4–27.29(c) and –27.31(a) requires that there be one of two alternative forms of representation at SVPA commitment hearings: (1) full representation of the committee by counsel, or (2) self-

23

representation by an individual who is competent to conduct his or her case, with standby counsel present throughout the hearing and available to assist the committee if needed.   The text of both provisions is consistent with the committee's conduct of his or her own defense while advised by standby counsel.   In future SVPA hearings, including D.Y.'s hearing on remand, competent SVPA committees may appear on their own behalf, with retained or appointed standby counsel present to assist them if necessary.

Given the compelling interests implicated by an SVPA commitment hearing in which the committee appears pro se—the individual's liberty, the public safety, and the integrity of the judicial process—we are confident that our experienced trial judges will conduct these proceedings with caution and care.   We offer the following general guidelines.

First, any decision by a committee to waive the right to full representation by counsel that N.J. [Stat. Ann. §] 30:4–27.31(a) affords to him or her should be clearly and unequivocally stated to the trial court, and the court should ensure that the committee's waiver of his or her right to full representation by counsel in his or her SVPA hearing is knowing, intelligent and voluntary.   In *State v. Crisafi*, [608 A.2d 317 (1992),] this Court prescribed the inquiry that trial courts should make when criminal defendants invoke their right to self-representation.   Before proceeding with an SVPA hearing, the trial court should conduct a similar inquiry to ensure that the committee is aware of his or her statutory right to be fully represented by counsel, and that he or she understands the importance of representation by an attorney in such a complex case.

Second, the role that standby counsel will play in a given SVPA hearing will be shaped by the specific issues confronting the court. Under the SVPA, the trial court must determine whether the individual "suffers from a mental abnormality or personality disorder," and whether, as a result of his or her condition, the individual is highly likely to reoffend unless he or she is confined. In a typical hearing, the State will present the testimony of one or more experts in psychiatry or psychology, and the committee's case is likely to be significantly buttressed if expert testimony is presented on his or her behalf.   It is the rare SVPA committee who is capable of planning an effective cross-examination of an expert testifying for the State, or who will know how to retain and prepare an expert to counter the State's evidence.   The skill and experience

24

of standby counsel in planning and conducting the hearing is critical to the fairness of the proceeding. A competent individual, who represents himself or herself at an SVPA hearing in compliance with the rules of court, cannot be compelled to accept the advice of his or her standby counsel. However, standby counsel serves as a resource, explaining the court's rulings and instructions to his or her client, guiding the committee through each stage of the hearing, and minimizing disruption and delay.

Finally, an SVPA committee appearing pro se should not be permitted to obstruct the proceedings. An individual's choice to proceed unrepresented does not authorize him or her to wrest control of the hearing from the trial court, or to undermine the judge's ability to make the important determination required by the SVPA. As the United States Supreme Court held in *Faretta*, [422 U.S. at 834 n. 46,] "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." If a committee flouts the court's instructions, demonstrates disrespect for the judge, counsel, court staff or a witness, or refuses to participate in the hearing, the trial judge should take appropriate action. In appropriate cases, the trial court may direct standby counsel to assume full representation of the committee, and resume the proceedings accordingly.

We recognize that our decision will impose an added burden on civil commitment judges, who are already charged with the challenging task of applying the SVPA. We anticipate that most individuals confronting the prospect of civil commitment will appreciate the strategic disadvantage of appearing pro se, and will accept the full representation of counsel that the statute affords. When a competent individual chooses the alternative of self-representation, standby counsel will be available to provide advice and guidance, and will assist the trial court in conducting an SVPA commitment hearing that is thorough and fair.

*D.Y.*, 95 A.3d at 170-73 (internal citations omitted).

In his self-representation claim, Petitioner essentially argues that the trial court judge and Appellate Division clerk involved in his commitment review hearings erred in failing to permit him to represent himself. Petitioner's claim, however, rests entirely on his assumption that *D.Y.*

25

retroactively invalidates cases such as his which were heard when all of the New Jersey courts to address the issue had concluded that assigned or hired counsel had to be present for an S.V.P. review hearing. Even if *D.Y.* were retroactive, Petitioner's claim would remain without merit. In this matter, the trial judge, having heard Petitioner's claim that he did not wish to be represented by assigned counsel, offered Petitioner an alternative – counsel would stay on to question and cross-examine the State's witnesses, but Petitioner would also be permitted to question the witnesses himself. Thus, the trial court in this matter, acting with admirable foresight, took exactly the middle road the New Jersey Supreme Court suggested would often be appropriate in *D.Y.* by forging a hybrid representation model wherein Petitioner received both the benefits of representation, and the ability to press his own concerns. A review of the record in this matter clearly indicates that the trial court was more than fair in dealing with Petitioner and permitting him to act for himself throughout the hearing while also receiving the benefit of counsel's superior experience with cross-examination and questioning expert witnesses. Thus, even if *D.Y.* did retroactively apply to Petitioner's hearing, the trial court's actions would clearly comport with the holding of that case, and it did not err in declining to permit Petitioner to simply fire assigned counsel at the outset. Petitioner's assertions regarding his appeal suffer from the same issue – nothing prevented Petitioner from filing a pro se supplemental brief, which he asserts he eventually did. Thus, Petitioner received all of the process he would have been due had *D.Y.* retroactively applied to his case.

The retroactivity of D.Y., however, is immaterial to Petitioner's current habeas petition in so much as an error of state law is insufficient to support an entitlement to habeas relief. *See* 28 U.S.C. § 2254(d)(1)-(2). Given the fact that Petitioner has no federally created right to represent

26

himself in a non-criminal matter as discussed above, the refusal of the state courts to permit Petitioner to represent himself at his commitment hearing was not contrary to nor an unreasonable application of any federal law as established by the Supreme Court. Petitioner is therefore not entitled to habeas relief.[4]

### 3. Petitioner's Consolidated Appeal Claim

Petitioner next asserts that the New Jersey Appellate Division erred in deciding both his appeals in a single, consolidated opinion. In making this claim, Petitioner claims that the Appellate Division, in deciding his two appeals together – one from a motion to enforce litigant's rights in which Petitioner challenged his denial of a job based on his treatment refusal as well as challenging his confinement, the other the direct appeal of his annual review hearing – failed to decide "90%" of his claims. Unhelpfully, Petitioner does not detail what claims were ignored, nor the expected result of those claims had they been properly raised. It has long been established that every court has the inherent power "to control the disposition of the [cases] on its docket with economy of time and effort for itself, for counsel, and for litigants." *See, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 252 (1936). The Appellate Division in this matter did so by combining Petitioner's two outstanding appeals – both of which dealt with issues arising out of Petitioner's involuntary civil commitment as a SVP, and thus involved similar factual and legal issues. After

---

[4] That Petitioner himself agreed to the hybrid representation at the start of his hearing buttresses this conclusion, and suggests that Petitioner's self-representation claim, even had it been meritorious, would have also have been subject to denial as an example of invited error. *See, e.g., United States v. Maury*, 695 F.3d 227, 256-57 (3d Cir. 2012) (invited error doctrine prevents a petitioner from raising a claim challenging an action of the trial court which he invited or induced through his own actions).

having consolidated the cases, the Appellate Division detailed the history and claims presented in both cases, and denied both of Petitioner's appeals in a single opinion.   Petitioner has failed to point out any clearly established federal law that this decision to consolidate his appeals was contrary to or unreasonably applied, and this Court is aware of none.   Given the fact that Petitioner has provided no facts sufficient to suggest that any of his allegedly ignored appellate arguments had any merit, this Court can only conclude that any error that could arguably have occurred via the consolidation was harmless, and thus provides no basis for habeas relief.   *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (habeas relief not warranted where a petitioner fails to show that the alleged error resulted in "actual prejudice" in so much as it had a "substantial and injurious effect or influence" on the result of the proceedings).

### 4.  Petitioner's Expert Witness Claim

Petitioner's final claim is that he was denied the ability to present his own experts, while the state was permitted to present two of its experts at Petitioner's review hearing, which Petitioner contends is a denial of due process and equal protection.   Petitioner's final argument, however, has several inherent problems.   First, Petitioner was not actually denied the ability to present his expert witnesses.   Although Petitioner told the trial court that he had experts ready to testify on his behalf (Document 10 attached to ECF No. 9 at 4-5), Petitioner never presented the name of any expert he intended to call, nor actually produced any such expert.   Indeed, the trial court specifically told Petitioner that if, after the hearing concluded, he did have an expert that was relevant, that the trial court would gladly entertain the testimony of such a witness and reopen Petitioner's case based on changed circumstances.   (*Id.*).   Thus, to assert that Petitioner was

28

denied the ability to present expert witnesses is disingenuous at best – Petitioner could have called experts had he had them, and even after his hearing concluded could have presented his alleged experts to the trial court to have his commitment matter reopened.   (*Id.*).   That he failed to do so falls not on the trial court judge, but rather on Petitioner himself.

Putting aside the fact that Petitioner's argument is unsupported by the record of his review hearing, Petitioner's claim is also fatally flawed in so much as Petitioner, despite claiming that he was denied an expert witness, has not provided anything which would purport to identify any expert who would have testified on his behalf, nor any information suggesting what testimony would have been provided.   Petitioner has certainly failed to provide anything akin to a certification or affidavit from such a witness.   Petitioner's failure to do so prevents this Court from being able to discern whether Petitioner suffered actual prejudice from his alleged inability to present expert testimony, and thus renders Petitioner's claim a conclusory allegation insufficient to warrant habeas relief.   *See, e.g., Judge*, 119 F. Supp. 3d at 285; *see also Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001); *Tolentino v. United States*, Civil Action No. 13–4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) ("[a petitioner's] failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a prima facie showing of prejudice").   Given Petitioner's failure to present any information as to what testimony the alleged expert witnesses would have provided, and given that Petitioner was provided an opportunity, even after his case had ended, to bring the testimony of any expert to the attention of the trial court judge, Petitioner's assertion that he was denied the ability to call an expert witness is unfounded and without merit.

29

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree with this Court's conclusion that all of the claims in Petitioner's petition are without merit, and he has therefore not shown that the issues presented are adequate to deserve encouragement to proceed further. No certificate of appealability shall therefore issue.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and no certificate of appealability shall issue.   An appropriate order follows.


Hon. Jose L. Linares,
United States District Judge
9/14/16

30